## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRYSTAL BROWN, On Behalf of Herself and Those Similarly Situated, | |
| Plaintiffs, | |
| v. | Case No. 3:24-CV-00665-NJR |
| SANTANDER CONSUMER USA INC., | |
| Defendant. | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Crystal Brown ("Brown") brings this putative class action on behalf of herself and others who financed the purchase of a car that—unbeknownst to them—was encumbered by a preexisting lien. Defendant Santander Consumer USA, Inc. ("Santander") buys the financing contracts from the dealerships that sell these vehicles, thus making it Brown's and the putative class members' creditor. Santander now moves to stay the case pending arbitration pursuant to section 3 of the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. § 3. (Doc. 33).

### FACTUAL AND PROCEDURAL BACKGROUND

On July 3, 2021, Brown bought a 2016 Honda Pilot from the Frank Leta Honda dealership in O'Fallon, Missouri. She financed over 95% of the purchase price pursuant to a Retail Installment Contract ("RIC") that was assigned to Santander on the same day. Brown did not know that the car was subject to a preexisting lien until she received a certificate of title showing two other "owners" and a bank as the "first lien" holder. These

encumbrances prevented her from registering her car in Missouri.

Brown requested a lien release from Santander so that she could resolve the preexisting lien. Santander refused to provide a lien release and demanded that Brown continue making payments on her car loan even though she was unable to register it.

Brown eventually fell behind on her payments. On March 13, 2023, she entered into an extension agreement, whereby Santander granted her a two-month extension to make certain payments due under the RIC (the "Extension Agreement"). (Doc. 35-3).

The Extension Agreement contained the following arbitration provision:

> **ARBITRATION.** As additional consideration for [Santander's] agreement to forbear from exercising its remedies under the [RIC], you and [Santander] agree that upon written request by either party . . . any Claim, except those specified below, shall be resolved by binding arbitration in accordance with (i) the Federal Arbitration Act, (ii) the Rules of the chosen Administrator, and (iii) this Arbitration Provision.

> (a) <u>Claims Covered</u>. "Claim" means any claim, dispute, or controversy now or hereafter existing between you and [Santander], including without limitation, any claims arising out of, in connection with, or relating to the [RIC], and any modification, extension, application, or inquiry of credit or forbearance of payment . . . any products, goods and/or services . . . purchased in connection with the [RIC], . . . whether the claim or dispute must be arbitrated, . . . [and] the validity of this [Extension Agreement]; . . . any claim or dispute based on an allegation of fraud or misrepresentation, including without limitation, fraud in the inducement of this or any other agreement, and any claim or dispute based on state or federal law, or an alleged tort.

The Extension Agreement also *excluded* from arbitration the following matters:

> The exercise of extra-judicial self-help repossession under applicable law or any action seeking to enforce a security interest or any action to effect the sale or transfer of the property being foreclosed (collectively "Excluded Actions") . . . However, any claim or dispute arising out of or relating to the exercise of such Excluded Actions is subject to arbitration in accordance with [the Extension Agreement].

Santander seeks to stay the case based on this arbitration provision.

## LEGAL STANDARD

Under section 2 of the FAA, arbitration agreements within a covered contract are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 gives effect to this substantive command by requiring federal courts "on application of one of the parties" to stay an action that raises an issue "referable to arbitration under an agreement in writing for such arbitration." *Id.* § 3. The Act reflects a "liberal federal policy favoring arbitration," *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and "requires courts to enforce [arbitration agreements] according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010).

But "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). At this step, state law plays an important role. State law "is applicable to determine which contracts are binding under § 2 and enforceable under § 3 *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) (internal quotation marks omitted). So, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v, Kaplan*, 514 U.S. 938, 944 (1995). Here, the parties and the Court agree that Missouri law provides the governing framework.

Courts "will not allow a party to unravel a contractual arbitration clause by arguing that the clause was part of a contract that is voidable." *Harter v. Iowa Grain Co.*, 220 F.3d 544, 550 (7th Cir. 2000) (citation modified). The party seeking to avoid arbitration "must show that the clause *itself*, which is to say the parties' agreement to arbitrate any disputes over the contract that might arise, is vitiated by fraud, lack of consideration or assent." *Id.* (citation modified). Thus, "when faced with motions to stay suits or order arbitration, courts should evaluate only the validity of the arbitration agreement; challenges to the validity of the entire contract—*e.g.*, fraud in the inducement—should be left to the arbitrator."[1] *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir 2010).

## DISCUSSION

Brown does not dispute her assent to the contractual language in the RIC or the Extension Agreement. Her signature appears on both documents and she neither contests the authenticity of her signatures nor the accuracy of the relevant contractual language. *See Harter*, 220 F.3d at 552 (parties' signatures supported existence of contractual relationship).

Instead, Brown contests the legal validity of the RIC, the Extension Agreement, and the arbitration clause itself. First, she argues that the RIC as a whole is invalid for a

---

[1] It is important to recognize the distinction between the *existence* of a contract containing an arbitration agreement and the *validity* of such a contract. The former is subject to judicial scrutiny; the latter, generally, is not. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."). "[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 449; *see also K.F.C. v. Snap Inc.*, 29 F.4th 835, 838 (7th Cir. 2022) (under *Buckeye*, "a challenge to the validity (as opposed to the existence) of a contract always goes to the arbitrator, no matter how states characterize their views about enforceability."). But "where the dispute at issue concerns contract *formation*, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 296 (2010) (emphasis added).

lack of consideration because she did not receive clear title to her car. Second, she contends that the Extension Agreement is invalid because it concerned payments she did not owe due to the invalidity of the RIC. Her third argument takes aim at the arbitration provision itself by contending it is not supported by a mutuality of obligations to arbitrate. Fourth, Brown asserts that the Extension Agreement was procured by mutual mistake and/or misrepresentation. And fifth, Brown argues that the delegation clause (which submits "gateway" questions of arbitrability to the arbitrator) is invalid. The Court will address each argument in turn.

A.   The RIC's Validity under Missouri Law

The Missouri Merchandising Practices Act ("MMPA") makes it "unlawful for any person to buy or sell . . . any motor vehicle or trailer registered under the laws of this state, unless, at the time of the delivery thereof, there shall pass between the parties such certificates of ownership with an assignment thereof." MO REV. STAT. 301.210.4. A sale that violates this requirement "shall be presumed fraudulent and void unless the parties have executed a written agreement for delayed delivery of certificate of ownership." *Id.* Brown invokes section 301.210 to argue that the RIC is void because she did not receive clear title to the car she bought. (Doc. 37 at p. 10 (Brown Resp. to Santander Mot. to Stay)). Separately, but relatedly, she contends that without clear title to the car, the RIC is also void for lack of consideration. At first blush, these arguments appear compelling. After all, why should a court enforce an arbitration provision within a contract that has no legal effect under the governing state's law?

But the U.S. Supreme Court and the Supreme Court of Missouri have firmly

rejected this line of reasoning. "[A]s a matter of federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). Agreements to arbitrate are "enforceable *apart from the remainder of the contract*," *Id.* at 446 (emphasis added), and thus must be enforced "according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye*, 546 U.S. at 445-46.

In *Buckeye*, the party seeking to avoid arbitration raised the same argument Brown raises here—that a contract that is void *ab initio* under state law is no contract at all. *Id.* at 447. And without a contract, so the argument went, there could be no arbitration agreement to enforce. *Id.* But the word "contract" as used in section 2 of the FAA, "include[s] contracts that later prove to be void." *Id.* at 448. So, even if Brown is correct that the RIC is void under Missouri law, it is up to the arbitrator, not this Court, to make that determination. *Id.*

The Missouri Supreme Court, for its part, has rejected the exact argument under the MMPA that Brown raises here. In *Ellis v. JF Enterprises, LLC*, 482 S.W.3d 417, 418 (Mo. 2016), the plaintiff, Ms. Ellis, purchased a car from the defendant, JF Enterprises, and signed a retail installment contract to finance the purchase. When she did not receive clear title to her new car, Ms. Ellis filed a petition for damages alleging that the sale violated section 301.210. *Id.* When JF Enterprises moved to compel arbitration, the court held that *Buckeye*'s severability rule precluded judicial review of the contract's validity because "the FAA, not Missouri law, governs what courts may consider in determining

whether an agreement to arbitrate is enforceable." *Id.* at 419. The court rejected the premise that a void contract under the MMPA (or state law generally) can vitiate an otherwise valid arbitration agreement:

> [N]o matter what state law infirmity the sales contract between Ms. Ellis and JF Enterprises may have, whether it fails for *lack of consideration, failure of consideration*, fraud in the inducement, unconscionability or being declared *"fraudulent and void" under section 301.210*, the Supreme Court has held—clearly and repeatedly—that such an infirmity is irrelevant to the enforceability of an arbitration agreement contained within or executed contemporaneously.

*Id.* at 423 (emphases added).

Here, Brown agreed to an expansive arbitration agreement that sends the question of "whether the claim or dispute must be arbitrated," "any claims arising out of, in connection with, or relating to the [RIC]," and "any claim or dispute based on state or federal law" to an arbitrator. Again, Brown does not dispute the accuracy of the relevant contractual language or her assent to it (her signature appears on the RIC and the Extension Agreement). *See Janiga*, 615 F.3d at 743 ("Janiga's signature—which he admits was given voluntarily—objectively demonstrated his assent to the contract"). Accordingly, the Court finds that the parties entered into an agreement to arbitrate certain disputes. *Cf. S.T.G. by and through Garcia v. Epic Games, Inc.*, 752 F. Supp. 3d 1200, 1208-09 (S.D. Cal. 2024) (minor's infancy defense to contract validity did not mean contract was never formed).

The nature of Brown's argument is critical because courts must "treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the

enforceability of the arbitration clause itself or claims that the agreement to arbitrate was never concluded." *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 301 (2010) (citation modified). Brown's first argument does neither because it challenges the *validity* of the RIC—a contract to which the arbitration agreement applies. The severability rule thus demands that this Court enforce the parties' agreement as written. *See Ellis*, 482 S.W.3d at 419 (enforcing arbitration agreement even though "[u]nder Missouri law, Ms. Ellis may be right" that retail installment contract is void). Brown may present her argument concerning the RIC's validity under Missouri law to an arbitrator.

B.  The Extension Agreement's Validity under Missouri Law

Brown's second argument is based on the same premise as her first. Because the RIC is void, she argues, so is the Extension Agreement containing the arbitration provision. Brown's view is that "the Extension Agreement's *raison d'être* was meaningless" because it extended payment due dates for payments that were not owed in the first place. And they were not owed, according to Brown, because the RIC was void.

This argument must be rejected for the same reason as the first. The Court may not examine the validity of the Extension Agreement to determine if its arbitration agreement should be enforced. What matters is that Brown entered into a contract that contains an arbitration clause. Whether that contract later proves to be void is beyond the scope of this Court's review. The arbitration agreement covers "any claim, dispute, or controversy . . . between [Brown] and [Santander], including without limitation, any claims arising out of, in connection with, or relating to the [RIC], . . . whether the claim or dispute must

be arbitrated, . . . [and] the validity of this [Extension Agreement]." Brown agreed to this provision by signing the Extension Agreement. It is this Court's job to enforce it "according to [its] terms." *Rent-A-Center*, 561 U.S. at 67. Thus, Brown's second argument that the Extension Agreement is invalid must also be decided by an arbitrator.

C.  <u>Santander's Promise to Arbitrate is Illusory</u>

Brown also contends that the agreement to arbitrate is "illusory" because it suffers from a lack of mutuality of obligations. This is so, she argues, because the arbitration agreement carves out certain "Excluded Actions" that Santander may litigate in court even though Brown is forced to arbitrate. The "Excluded Actions" provision states that the following matters "will not be arbitrated:"

> The exercise of extra-judicial self-help repossession under applicable law or any action seeking to enforce a security interest or any action to effect the sale or transfer of the property being foreclosed (collectively "Excluded Actions") . . . However, any claim or dispute arising out of or relating to the exercise of such Excluded Actions is subject to arbitration in accordance with [the Extension Agreement]. (Doc. 35-3 at p. 6).

Brown takes issue with Santander's right to "extra-judicial self-help repossession" and to litigate "any action seeking to enforce a security interest" because it allows Santander to bring the claims it cares about in court, while forcing her into an arbitral forum. Thus, she argues, Santander's promise to arbitrate is illusory and the arbitration agreement invalid because it is not supported by consideration. This argument is an appropriate candidate for judicial review because it specifically targets the parties' agreement to arbitrate. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that FAA "permits *agreements to arbitrate* to be invalidated by generally

applicable contract defenses") (emphasis added, quotation marks omitted).

Brown principally relies on the Missouri Court of Appeals' decision in *Greene v. Alliance Auto., Inc.*, 435 S.W.3d 646 (Mo. Ct. App. 2014), to support her argument that a valid arbitration agreement requires a mutual promise to arbitrate. In *Greene*, the plaintiff signed an arbitration agreement in connection with the purchase of a car. *Id.* at 648. The arbitration agreement included a self-help clause, which, in addition to granting the right to self-help, stipulated that neither party waived its right to arbitration in the event of a dispute. *Id.* at 652. The court held that the availability of the self-help remedy in conjunction with the retention of a right to arbitration invariably favored the defendant so that the arbitration clause suffered from a lack of mutual obligations. *Id.* at 653-54. As the court saw it, "if the anti-waiver provision means that [the defendant] can exercise its primary remedy of self-help repossession without waiving arbitration of other disputes, then the agreement itself allows [the defendant] to unilaterally divest itself from the promise to arbitrate." *Id.* at 654. And because there was "no mutual promise to arbitrate," the court went on to explain, the arbitration agreement was invalid for a lack of consideration. *Id.*

The Supreme Court of Missouri appears to have limited *Greene* in an important way. In *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 430 (Mo. 2015), the plaintiff, Mr. Eaton, purchased a manufactured home from the defendant, CMH Homes ("CMH"). The sales contract contained an arbitration provision, which included a self-help clause that allowed CMH "to use judicial . . . or non-judicial relief to enforce a security agreement" relating to the home. *Id.* Like in *Greene*, the arbitration clause also contained an anti-

waiver provision which stated that "[t]he institution and maintenance of a lawsuit to foreclose upon any collateral . . . shall not constitute a waiver of the right of any party to compel arbitration." *Id.* at 430-31. After a dispute arose, Mr. Eaton sued CMH and CMH moved to compel arbitration. *Id.* at 431.

Mr. Eaton raised the same argument that Brown raises here—that the arbitration agreement was invalid because it did not contain "mutual agreements to arbitrate." *Id.* at 433. "Unless both parties are required to arbitrate all or comparable claims," Mr. Eaton argued, "the agreement to arbitrate is not mutual and, so, not supported by adequate consideration." *Id.* The court disagreed. "[A]s long as the contract as a whole meets the consideration requirement, the arbitration clause in the contract will not be invalidated for a lack of mutuality of the obligation to arbitrate." *Id.* To examine consideration only within the bounds of the arbitration agreement, the court found, was inconsistent with the majority view that "mutuality is satisfied if there is consideration as to the whole agreement, regardless of whether the included arbitration clause itself was one-sided." *Id.* at 434 (quoting *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 858 (Mo. 2006)). Thus, "[t]he lack of mutuality as to the arbitration agreement does not itself invalidate that arbitration agreement." *Id.*

The Missouri Court of Appeals has since questioned whether *Greene* remains viable in light of *Eaton*. *See TD Auto Fin., LLC v. Bedrosian*, 609 S.W.3d 763, 769 n.6 (Mo. Ct. App. 2020). *Bedrosian* observed a logical incompatibility between the two cases because *Greene* "evaluated consideration by looking solely at the arbitration agreement," whereas *Eaton* requires courts to "look to the contract as a whole in determining whether

consideration is adequate rather than looking solely at the consideration given for the agreement to arbitrate." *Id.* Here, the question whether *Greene* or *Eaton* applies is dispositive of Brown's argument that the arbitration agreement is invalid for a lack of consideration. This is so because the arbitration agreement is similarly one-sided as those addressed in *Greene* and *Eaton*. Santander may invoke a self-help remedy and litigate "any action seeking to enforce a security interest," while Brown is forced to arbitrate. And if this Court confines its review to the arbitration agreement *only*, Brown may have persuasive argument that the agreement is invalid under *Greene*.

Ultimately, it is neither appropriate nor necessary for this Court to decide whether, and, if so, how, *Eaton* affects the viability of *Greene* as to this issue. This Court's job is to apply "state-law principles that govern the formation of contracts" to determine the validity of the arbitration agreement. *First Options*, 514 U.S. at 944. Here, that means that *Eaton*, a decision from the Missouri Supreme Court, governs. And with *Eaton* in mind, the Court must look to the *entire contract* to determine whether the arbitration agreement is supported by consideration.

Under the *Eaton* framework, the question of consideration becomes rather simple. Brown got a car in return for her promise to pay for it. Santander extended financing to facilitate the transaction in return for Brown's promise to make payments under the RIC. When she needed more time to make her payments, Santander extended the due dates in return for her promise to arbitrate. Consideration was exchanged several times over. That is dispositive of Brown's argument that the arbitration agreement is invalid for a lack of

mutual promises to arbitrate.[2] It is not. *See Eaton*, 461 S.W.3d at 434 (lack of mutual

agreement to arbitrate alone did not render arbitration agreement invalid because "[b]oth

parties exchanged consideration for the entire contract: Mr. Eaton paid the purchase price

and CMH provided Mr. Eaton with the home."); *accord Bedrosian*, 609 S.W.3d at 769

("Mutuality . . . is satisfied if there is consideration as to the whole agreement, regardless

of whether the included arbitration clause itself was one sided.").

D.  <u>The Arbitration Clause is void due to Mistake and/or Misrepresentation</u>

Brown's next argument is that the Extension Agreement should not be enforced

because it is tainted by a mutual mistake. The mistake, according to Brown, is that, in

executing the Extension Agreement, the parties "operat[ed] under the misconception that

Brown still owed payments under the RIC" when "[i]n fact, the RIC was void, and those

---

[2] Although *Eaton* held that a lack of mutual promises to arbitrate *alone* does not render an arbitration agreement invalid, "a lack of mutuality still is a relevant factor to be considered in answering the larger question of whether the agreement to arbitrate is unconscionable." *Eaton*, 461 S.W.3d at 434. In *Eaton*, the arbitration agreement contained an anti-waiver provision that required Mr. Eaton to arbitrate any "counterclaims" he may have in an enforcement action that CMH could bring in court. *Id.* The anti-waiver provision thus "could create the anomalous situation where [Mr. Eaton's] affirmative defenses and counterclaims to claims made by CMH in court must proceed in arbitration at the same time as CMH proceeds on those same claims in court." *Id.* And for that reason, the anti-waiver provision "considered together with the lack of mutuality of the obligation to arbitrate," rendered the arbitration agreement unconscionable. *Id.*

Brown attempts to make a similar argument. The "Excluded Actions" provision of the arbitration agreement states that "any claim or dispute arising out of or relating to the exercise of such Excluded Actions is subject to arbitration." According to Brown, this provision functions much like the anti-waiver provision in *Eaton*, because it forces her to arbitrate her defenses to an enforcement action, which Santander may bring in court. The Court acknowledges this possibility. But *Eaton* found that the anti-waiver provision was severable from the remainder of the contract pursuant to a severability clause, and that the arbitration agreement was thus not unconscionable. *Id.* at 436-37. The Extension Agreement also contains a severability clause, which is triggered if "any provision of or obligation under this [Extension] Agreement is invalid, illegal or unenforceable." (Doc. 35-3 at p. 6). Assuming—without deciding—that the arbitration agreement is unconscionable due to the anti-waiver clause, *Eaton*'s severability analysis would nevertheless be binding and lead to the same outcome because the Extension Agreement contained a broad severability clause and the anti-waiver provision "is not essential to the agreement to arbitrate." *Id.* at 437.

payments were not owed." (Doc. 37 at p. 17). Moreover, because the doctrine of mutual mistake is based on equitable considerations, Brown points to her unequal bargaining position vis-à-vis Santander as a basis for relief from the Extension Agreement.

The underlying premise of this argument is that the RIC is legally void. The Court would have to make that finding before it could offer Brown the relief she seeks: rescission of the Extension Agreement and relief from the arbitration agreement. But to get to that point, the Court would have to evaluate the validity of the RIC. Such inquiries, as noted, are inappropriate in deciding whether to enforce an arbitration agreement. *See Rent-A-Center*, 561 U.S. at 70 ("a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate"); *Buckeye*, 546 U.S. at 445 (explaining severability rule). So, without commenting on the merits of Brown's argument regarding mutual mistake, the Court simply recognizes that it is inappropriate for resolution here. Under *Buckeye* and its progeny, the issue must be decided by an arbitrator.

Brown also invokes the doctrine of misrepresentation as a basis for relief from the Extension Agreement. She alleges that Santander "negligently misrepresented to Brown that she owed payments under the RIC to induce her to enter into the Extension Agreement." This argument suffers from the same infirmity as the previous one. The Court would have to analyze the RIC's validity to determine whether Brown in fact "owed payments." And if Brown is incorrect and *did* owe payments, then her argument concerning Santander's misrepresentation falls apart. Whether these legal arguments ultimately prevail is beside the point. All that matters is that the Court is barred from

considering them at this stage of the litigation. *See Ellis*, 482 S.W.3d at 419 (enforcing arbitration agreement even though "[u]nder Missouri law, Ms. Ellis may be right" that retail installment contract is void).

E.  The Delegation Clause

Brown's final argument takes aim at a provision within the arbitration agreement called a "delegation clause." "A delegation clause gives an arbitrator authority to decide even the initial question whether the parties' dispute is subject to arbitration." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111-12 (2019). Here, the delegation clause provides in relevant part that an arbitrator must decide "whether the claim or dispute must be arbitrated, . . . [and] the validity of this [Extension Agreement]." Santander, in its reply brief, cited the delegation clause to argue that the gateway question of arbitrability—*i.e.*, whether Brown's claims must be arbitrated—should be decided by an arbitrator.

Brown, for her part, argues that the "delegation clause is void and therefore inapplicable because the RIC and Extension [Agreement] are void in their entirety." This argument follows the same logic as her first, second, and fourth arguments. By contesting the validity of the underlying contracts, Brown asks the Court to determine if they are compliant with Missouri law before enforcing the arbitration agreement. But having found that a valid arbitration agreement exists, the Court is in no position to do that. "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein*, 586 U.S. at 68.

Brown nevertheless insists that her challenges to the validity of the RIC and

Extension Agreement are fair game because they apply "equally" to those contracts in general *and* to the delegation clause specifically. In effect, Brown presents the RIC and Extension Agreement's alleged invalidity as a dispute about the existence of a valid arbitration agreement, something the Court is required to address. This is so because, as noted, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Id.* at 69.

Brown relies on the Supreme Court's decision in *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024), to support her invitation for a full-blown review of the validity of the RIC and Extension Agreement. In *Coinbase*, the parties agreed to two separate contracts: (i) a user agreement that contained an arbitration agreement with a delegation clause, and (ii) the "Official Rules" of a sweepstakes. *Id.* at 146-47. The user agreement submitted substantive claims and their arbitrability to an arbitrator. *Id.* at 146. The Official Rules contained a forum selection clause, which sent the parties' dispute to the California state courts. *Id.* at 146-47. Coinbase, the party seeking arbitration, argued that the arbitration agreement was severable and "established the terms by which all subsequent disputes were to be resolved." *Id.* at 145. Suski, the party resisting arbitration, contended that the second contract's forum selection clause superseded the first contract's arbitration agreement. *Id.* Thus, the question presented was a narrow one: "who—a judge or an arbitrator—should decide whether a subsequent contract supersedes an earlier arbitration agreement that contains a delegation clause." *Id.* at 147.

The Court observed that because arbitration agreements are simply contractual arrangements between the parties, "the first question in any arbitration dispute must be:

What have these parties agreed to?" *Id.* at 148. It followed then that the "conflict between the delegation clause in the first contract and forum selection clause in the second" was simply a question of "whether the parties agreed to send the given dispute to arbitration." *Id.* at 150. And "*that* question must be answered by a court." *Id.* (emphasis in original).

The Court rejected the proposition that the severability principle required it to "isolate[]" the delegation clause and consider only arguments "specific to that provision." *Id.* at 150. The severability principle, it explained, does not demand challenges that *only* target the arbitration or delegation provisions in a contract. *Id.* at 151. "Rather, where a challenge applies "equally" to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Id.* Brown seizes on this comment to contend that her arguments concerning the validity of the RIC and Extension Agreement too, apply "equally" to the delegation clause. And therefore, she contends, the Court, and not an arbitrator, must address these arguments on the merits before staying the case pending arbitration.

But *Coinbase* is distinguishable—both in its ultimate holding and on its facts. *Coinbase* held that where "parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Id.* at 152. *Coinbase* thus explained *who* resolves the question of what the parties agreed to; it did not address the question of whether the delegation clause was legally valid, nor did it purport to modify the severability principle. The Court's observation that courts (not arbitrators) must decide challenges that apply "'equally' to the whole contract and to an arbitration

or delegation provision" was necessary under the circumstances because the delegation clause, standing alone, could not have resolved the critical question of what the parties agreed to.

Therein lies an important distinction to this case. The parties in *Coinbase* disputed whether the contract containing the arbitration agreement had been "superseded"—*i.e.*, whether it accurately reflected their contractual agreement. Brown, on the other hand, does not dispute her assent to the arbitration agreement or the delegation clause. There is no preexisting or subsequent contract that contradicts the substance of the arbitration agreement. Instead, Brown argues that she is not bound by it because the contracts to which it applies are void under state law. *That* issue is subject to the severability principle under *Buckeye*—a decision that *Coinbase* did not modify. *See Hines v. Nat. Ent. Grp., LLC*, 140 F.4th 322, 333 (6th Cir. 2025) (observing that *Coinbase* did not modify severability principle); *S.T.G.*, 752 F. Supp. 3d at 1210 (rejecting similar invocation of *Coinbase*). And for that reason, the delegation clause must be enforced according to its terms.

Brown's final argument concerning the delegation clause is that it fails to "clearly and unmistakably" submit questions of contract formation to the arbitrator. It is well settled that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options*, 514 U.S. at 944 (citation modified). Brown is correct that the word "formation" does not appear in the arbitration agreement. But an exact linguistic match is not necessary. *See In re StockX Customer Data Security Breach Litig.*, 19 F.4th 873, 878-79 (6th Cir. 2021). The delegation clause sends questions of "whether the claim or dispute must be arbitrated, . . . [and] the

validity of this [Extension Agreement]" to an arbitrator. Brown's contract "formation" arguments, at their core, dispute "whether the claim or dispute must be arbitrated." The arbitration agreement clearly and unmistakably submits such disputes to an arbitrator.[3]

### CONCLUSION

For these reasons, Santander's Motion to Stay the case pending arbitration (Doc. 33) is **GRANTED**. The parties **SHALL** file a joint status report on or before **September 8, 2025**, informing the Court whether they will pursue arbitration. The joint status report **SHALL** also provide an expected timeline for arbitration and proposed next steps in the case.

**IT IS SO ORDERED.**

**DATED:  August 8, 2025**

_s/ Nancy J. Rosenstengel_
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

---

[3] Brown also contends that Santander waived its ability to invoke the delegation clause because, in its motion to stay, it asked the Court to rule on arbitrability. The Court previously rejected this argument in its July 15, 2025 order denying Brown's motion to strike Santander's reply brief. (Doc. 46).